# EXHIBIT A

Henry P. Wolfe, Esq. (NJ Atty 031942005)
Javier L. Merino, Esq. (NJ Atty 078112014)
Andrew R. Wolf, Esq. (NJ Atty 018621995)
**THE DANN LAW FIRM PC**
825 Georges Road, 2nd Floor
North Brunswick, NJ 08902
(201) 500-4060
notices@dannlaw.com
*Counsel for the Plaintiff and others similarly situated*

| | |
|---|---|
| Rachael Gnadinger, Madeline McCausland, and Joanne Nebus-Horning, on behalf of themselves and others similarly situated, <br><br> *Plaintiffs*, <br> v. <br><br> Athena Bitcoin, Inc., Matias Goldenhörn, Sam Nazzaro, Eric Gravengaard, Gilbert Valentine, Routine Management LLC d/b/a Rahway Shell, Emrud Lil d/b/a One Stop Shoppe, Jiah Corp., d/b/a Holmdel Exxon, and John Doe Convenience Stores, <br><br> *Defendants*. | SUPERIOR COURT OF NEW JERSEY <br> LAW DIVISION <br> MIDDLESEX COUNTY <br><br> CIVIL ACTION <br><br> Case No.:  MID-L-          -25 <br><br> **CLASS ACTION COMPLAINT** <br> **with JURY DEMAND** |

The Plaintiffs, on behalf of themselves and others similarly situated, state for their Complaint as follows:

### SUMMARY OF CASE

1. This is a putative class action under the Consumer Fraud Act and other New Jersey laws to remediate and enjoin the Defendants' knowing facilitation of "impersonation scams" through the criminally negligent operation of "Bitcoin ATMs" which are devices for converting physical cash to Bitcoin cryptocurrency and transferring it to anonymous online accounts called "wallets".  The devices resemble ordinary ATMs and are typically installed in convenience stores, gas station shops, and similar establishments.

2.  The named Plaintiffs are New Jersey citizens who fell victim and to "impersonation scams" perpetrated by anonymous organized criminals who posed as representatives of tech service companies, banks, and government agencies and convinced the Plaintiffs that they were in imminent financial and legal peril that could only be averted by withdrawing the cash from their bank accounts and depositing it into Athena Bitcoin ATMs at specified New Jersey locations.

3.  Athena gladly accepted the Plaintiffs' highly suspicious ATM deposits (which included single-transaction deposits of $34,100, $20,800, $10,000, $9,900 and $5,000 by individuals who Athena knew to be first-time users, including two senior citizens), and, without further scrutiny, transferred the cash (less a 25% fee) as Bitcoin to an unsecured online "wallet" controlled by the scammers, who then transferred the funds to untraceable accounts, foreclosing any possibility of recovery by law enforcement agencies..

4.  The scammers, like many before them, specifically chose Athena to assist in their crimes because of the company's long history of lax anti-crime practices and routine, unquestioning approval of multi-thousand-dollar transactions by newly registered users, which a reasonable person would recognize as being derived from a scam or other criminal activity.

5.  Athena has openly acknowledged since at least 2017 that its Bitcoin ATMs are regularly used by impersonation scam syndicates to facilitate their crimes, and has posted "Scam Alerts" on its website and on its ATMs continuously since then, reporting that it "receives numerous reports of [such] fraud per month"  www.athenabitcoin.com/avoid-these-bitcoin-scams (last visited May 30, 2025)(copy attached as Exhibit A).  These admissions are consistent with

recent government and law enforcement reports of the rising epidemic of impersonation scams facilitated by Athena and similar Bitcoin ATM operators[1],

6.  Athena has previously implemented effective policies and practices for detecting and preventing impersonation scams at its ATMs, demonstrating that it has the capability and means to do so.

7.  For example, in March 2017, Athena reported that it had "implemented a system" to prevent scams at its ATMs "by which we freeze transactions for first time buyers. We then call them, interview them by phone [and] write back and forth on e-mail" to screen for possible scams. Within six weeks of implementing this "system," Athena was able "to return $30,000 worth of funds" to scam victims "who otherwise would have been completely screwed" www.youtube.com/watch?v=H4KgClyKsCI, at [00:12:18 – 00:13:13] (speech delivered by Athena's then-Chief Compliance Officer, Gilbert Valentine on March 28, 2017)  A screenshot of the "Fraud Detection" slide displayed during the speech is attached as Exhibit B

---

[1] See, e.g., Federal Trade Commission (FTC), *Bitcoin ATMs: A payment portal for scammers* (September 3, 2024)(Losses from Bitcoin ATM-enabled scams "are skyrocketing, increasing nearly tenfold from 2020 to 2023," with reported scams "overwhelmingly about government impersonation, business impersonation, and tech support scams," and that "people 60 and over were more than three times as likely as younger adults to report a loss using a BTM.") online at www.ftc.gov/news-events/data-visualizations/data-spotlight/2024/09/bitcoin-atms-payment -portal-scammers; Federal Bureau of Investigation (FBI), *The FBI Warns of Fraudulent Schemes Leveraging Cryptocurrency ATMs and QR Codes to Facilitate Payment* (November 4, 2021) ("The FBI has seen an increase in scammers directing victims to use physical cryptocurrency ATMs and digital QR codes to complete payment transactions.") www.ic3.gov/PSA/2021/PSA211104; New Jersey Commission of Investigation, *Bitcoin ATMs: Scams, Suspicious Transactions, and Questionable Practices at Cryptocurrency Kiosks* (February 2021) (Commission's investigation "of records subpoenaed from 30 businesses that operated or were associated with…cryptocurrency kiosks in New Jersey over the last five years" found "numerous instances where unwitting victims were duped into sending cryptocurrency to unknown wallets through the machines, including some schemes that resulted in the loss of tens of thousands of dollars.") www.nj.gov/sci/ pdf/SCI%20Bitcoin%20Report.pdf

8.  Similarly, in July 2019, Athena reported that it had implemented a daily transaction limit of $9,500 and heightened security measures for transactions exceeding $3,000, as part of its policy to comply with financial crime and terrorism prevention regulations. www.youtube.com/watch?v=2_hyMd-26I8, at [00:11:20 – 00:11:49] (interview of Gilbert Valentine and Eric Gravengaard, July 2, 2019).

9.   Athena has since elected to abandon these safeguards, as evident from the Plaintiffs' scams, in which Athena instantly approved transactions by new users far exceeding the former $9,500 threshold, including single-transaction purchases of $34,100, $20,800, $10,000 and $9,900.

10. Athena knows that deposits of this size, especially by new customers, are strongly indicative of impersonation scams or other criminal activity, because, according to Athena, its Bitcoin ATM services are designed and intended only for relatively small transactions, such as online purchases and sending a few hundred dollars to family members in other countries www.youtube.com/watch?v=H4KgClyKsCI at [00:20:30 – 00:24:50](Gilbert Valentine presentation on Athena Bitcoin ATM "Use Cases").   A screenshot of the "Use Cases" slide displayed during the speech is attached as Exhibit C.

11. According to Athena's founder and former CEO, the company's Bitcoin ATM services are intended for small, time-sensitive transactions, for example, if "you need $200 of Bitcoin today to pay someone," and are not suitable for high-cost transactions because of the high percentage transaction fee Athena charges for instantaneous cash-to-Bitcoin transactions www.youtube.com/watch?v=2_hyMd-26I8 at [00:45:50 – 00:48:02] (Eric Gravengaard interview, July 2, 2019, explaining that Athena's high percentage fee translates to a few dollars given the "average transaction sizes" and advising, "If you're going to go and invest $25,000 in Bitcoin… please don't use our machines.. It's not the right model for an investment. You

know, you… should be very fee conscious on a large investment like that. But if you need $200 of Bitcoin today to pay someone, then yeah, absolutely go and get [it from] our machines…").

12. After abandoning the system it used to successfully detect and prevent scams in 2017, and the $9,500 daily transaction limit it maintained in 2019, Athena continued to post Scam Alerts and warnings on its website and ATMs, and in 2022, updated its website to acknowledge that "Athena receives numerous reports of [such] fraud per month" and to provide additional details about various scams.  www.athenabitcoin.com/avoid-these-bitcoin-scam (Exhibit A)

13. Athena has used the "warnings" on its ATMs to deny requests for compensation from victims of impersonation scams enabled by Athena's failure to operate its Bitcoin ATM business in a safe and responsible manner, as it once did, however briefly, in 2017.

14. However, Athena knows that these warnings have proven to be ineffective, and that they are *predictably* ineffective given the state of panic, fear, and obedience that impersonation scammers instill in their victims, as *described by Athena* on its website.

> Imagine being in a panic thinking that you will be arrested or that money is about to be drained out of your bank account? Imagine having someone on the phone with you for hours making sure you obey their instructions? Thousands of people each year don't have to imagine…."

www.athenabitcoin.com/the-most-common-bitcoin-scam-that-we-see, (last visited May 30, 2025)(copy attached as Exhibit D).  Athena's chilling description of the experience of a victim of an impersonation scam, posted in 2022 on its website (which prospective impersonation scam victims have no reason to visit) is exactly what occurred to the Plaintiffs in 2024 and 2025.

15. On September 11, 2024, the U.S. Senate Banking Committee issued a letter to Athena, calling on the company "to take immediate action to address troubling reports that your Bitcoin ATMs (BTMs) are contributing to widespread financial fraud against elderly Americans" and

requesting information regarding "what actions Athena Bitcoin is taking to address this problem" including whether "Athena Bitcoin limit[s] the amount an individual can deposit or transfer in a single day, week, or other period of time," whether "Athena Bitcoin hold[s] deposited and transferred funds for any period of time or take[s] any other measures to allow transactions to be reversed in the case of fraud or mistake" and whether "Athena Bitcoin insure depositors against fraud[.]" A copy of the letter is attached as Exhibit E.

16. To Plaintiffs' knowledge, Athena never responded to the Senators' inquiry.

17. Plaintiffs now bring this action on behalf of themselves and other victims of Athena's unconscionable and criminally negligent operation of its Bitcoin ATM business in New Jersey, against Athena, its current and former officers responsible for the enterprise's reprehensible policies and practices relating to monitoring and prevention of financial crime, and the convenience store "partners" who make Athena's ATMs available to the public, knowing that they are regularly used in scams, asserting claims under the Consumer Fraud Act, common law negligence and recklessness, the Civil Action of Possession of Stolen Property Statute, and the New Jersey Racketeer Influenced and Corrupt Organizations Act, seeking a judgment for monetary relief to compensate victims of Defendants wrongdoing, and injunctive relief, requiring Athena to take "take immediate action" to reform its policies and practices, as demanded by the Senate Banking Committee, but disregarded by Athena.

## PARTIES

18. Plaintiff Rachel Gnadinger is an individual who resides in Avenel, New Jersey.

19. Plaintiff Madeline McCausland is an individual who resides in Runnemede, New Jersey.

20. Plaintiff Joanne Nebus-Horning is an individual who resides in Aberdeen, New Jersey.

21. Defendant, Athena Bitcoin, Inc. ("Athena") is a Delaware corporation with its principal place of business in Florida.  It is among the largest operators of "Bitcoin ATM" cryptocurrency kiosks in the United States, with over 50 Bitcoin ATMs in New Jersey.

22. Defendant Matias Goldenhörn is the current CEO of Athena Bitcoin, Inc. and was personally involved in devising, instituting, directing, and maintaining the corporation's policies and practices alleged herein.

23. Defendant Sam Nazzaro is the current Chief Compliance Officer of Athena Bitcoin, Inc. and was personally involved in devising, instituting, directing, and maintaining the corporation's policies and practices alleged herein.

24. Defendant Eric Gravengaard is the co-founder, former CEO, and shareholder of Athena Bitcoin, Inc. and was personally involved in devising, instituting, directing, and passing on the corporation's policies and practices alleged herein.

25. Defendant Gilbert Valentine is the co-founder, former Chief Compliance Officer, and shareholder of Athena Bitcoin, Inc. and was personally involved in devising, instituting, directing, and passing on the corporation's policies and practices alleged herein.

26. Defendant Routine Management LLC d/b/a Rahway Shell (hereinafter "Rahway Shell") is a New Jersey limited liability that owns and operates Rahway Shell, a gas station and convenience store business located at 1659 Saint Georges Ave, Rahway, New Jersey, which partnered with Athena by permitting it to install, operate, and maintain an Athena Bitcoin ATM kiosk inside the store, which was used to facilitate the impersonation scam perpetrated against the Plaintiff Rachael Gnadinger.

27. Defendant Ermud Lil d/b/a One Stop Shoppe (hereinafter, "One Stop Shoppe") is an individual who owns and operates One Stop Shoppe, a convenience store located at 980 Creek Road,

Bellmawr, New Jersey, which partnered with Athena by permitting it to install, operate, and maintain an Athena Bitcoin ATM kiosk inside the store, which was used to facilitate the impersonation scam perpetrated against the Plaintiff Madeline McCausland.

28. Defendant Jiah Corp d/b/a Exxon of Holmdel (hereinafter, "Holmdel Exxon") is a New Jersey corporation that owns and operates Exxon of Holmdel, a gas station and convenience store business located at 2055 Route 35, Holmdel, New Jersey, which partnered with Athena by permitting it to install, operate, and maintain an Athena Bitcoin ATM kiosk inside the store, which was used to facilitate the impersonation scam perpetrated against the Plaintiff Joanne Nebus-Horning.

29. Defendants John Doe Convenience Stores are other convenience stores and vape shops located in New Jersey that have similarly partnered with Athena by permitting it to install, operate, and maintain an Athena Bitcoin ATM kiosk inside the store, which was subsequently used to facilitate at least one impersonation scam.

## ALLEGATIONS

### i.   **Athena's Bitcoin ATM Services – General Description**

30. Athena began operation of Bitcoin ATMs in the United States in 2015.

31. Bitcoin ATMs are publicly accessible kiosks that convert cash to Bitcoin cryptocurrency transmitted to an anonymous online account called a Bitcoin "wallet." The kiosks resemble ordinary ATMs with a keypad and touchscreen display and `also feature a bill acceptor slot for inserting the cash, and a camera to scan a QR code associated with the wallet to which the funds will be transferred.

32. Athena's Bitcoin ATM services differ from traditional online Bitcoin exchange services in several respects, including, without limitation:

a.   Athena's ATMs provide direct cash-to-Bitcoin transfers, while traditional online Bitcoin exchanges require the use of a bank account or credit card;

b.   Athena's ATMs provide for transfer of Bitcoin to the designated wallet with little or no delay after payment, while purchases at traditional online exchanges typically require substantial waiting time between payment and transfer; and

c.   Athena's ATM transactions use only "non-custodial" wallets, which are wallets brought to the transaction by the user (or sometimes generated by the ATM at the user's request), with Athena having no control or knowledge of who has access to the wallet's "private keys" (codes that enable Bitcoin contained in the wallet to be withdrawn and transferred to another account), while many online Bitcoin exchanges require purchasers to use "custodial" wallets provided by the exchange, which retains control of the private keys (similar to a traditional bank retaining the keys to its vault) and transfers Bitcoin at the direction of the purchaser, subject to applicable anti-financial crime and anti-terrorism regulations.

33. Athena markets its Bitcoin ATM services as providing enhanced speed, convenience, privacy, and freedom (see e.g., [www.athenabitcoin.com/unlock-financial-freedom-with-athena-bitcoin-atms/](http://www.athenabitcoin.com/unlock-financial-freedom-with-athena-bitcoin-atms/) (last visited May 30, 2025)) and charges substantially higher transaction fees than traditional online Bitcoin exchange services for these purported advantages.

34. For example, in the transactions involving the named Plaintiffs, Athena retained approximately 25% of the amount of cash inserted into the machines as a fee (or "spread," as Athena refers to it) before converting and transmitting the remaining portion to scammers' wallets.

ii. **Athena's Bitcoin ATM Services – Legitimate "Use Cases"**

35. Unlike traditional online Bitcoin exchanges, Athena's Bitcoin ATM services are not designed or intended for investments or other high-cost purchases due to the high percentage transaction fees, as explained by Athena's co-founder and former CEO, Eric Gravengaard in a July 2, 2019 interview,

> [Athena's Bitcoin ATM service] is not for investors. If you're going to go and invest, you know, $25,000 in Bitcoin, one, please don't use our machines and then two, don't use any machine. It's not the right model for an investment. You know, you might be more fee- or you should be very fee conscious on a large investment like that.
>
> But if you need $200 of Bitcoin today to pay someone, then yeah, absolutely go and get our machines and get it immediately.

Interview at www.youtube.com/watch?v=2_hyMd-26I8,  "Operating Bitcoin ATMs with Gil Valentine & Eric Gravengaard from Athena Bitcoin," [00:47:30 – 00:48:00].

36. Athena's Bitcoin ATMs' unsuitability for multi-thousand dollar transactions is also evident from the mode of payment adopted for the service, which requires the user to bring cash to a gas station, convenience store, or similar unsecured public place and feed it into a bill acceptor one bill at a time, in a plain sight of whoever else happens to enter the gas station or convenience store during the transaction.

37. The typical "use cases" for Athena's Bitcoin ATM services, as described by Athena's co-founder and former Chief Compliance Officer, Gilbert Valentine in a presentation recorded on March 28, 2017, include:

- Cross Border Remittance
- Custody of Funds When Travelling Internationally
- Payment of Goods Being Bought from International Sellers
- Payment of Goods Being Bought Domestically
- Investment[2]
- Online Purchases

---

[2] The brief discussion of this item [00:22:18 – 00:22:28] describes casual impulse purchases by users who "heard about" Bitcoin and want to try buying some.

Exhibit C (screenshot of "Use Cases" slide from presentation); Video of presentation at www.youtube.com/watch?v=H4KgClyKsCI, "Operating a Bitcoin ATM Business: Tales from the Front Line," ("Use Cases" discussion at [00:20:24 – 00:22:47]).

38.  In his presentation, Mr. Valentine explained, "I'm not going to get into the use cases that might be borderline legal." *Id.* [00:20:33 – 00:20:38].

39.  As noted by Mr. Valentine, Athena's Bitcoin ATMs are commonly used for cross-border remittances[3], which are money transfers between countries, often from workers to their families back home, and which average about $200 - $300 per transaction. See e.g., www.un.org/en/desa/remittances-matter-8-facts-you-don%E2%80%99t-know-about-money-migrants-send-back-home.

40. The only other "use cases" described in Athena's marketing materials or public statements are similarly low-value transactions, for example, a $500 purchase of human hair from a Chinese merchant, unspecified incidental "travel expenses" to avoid airport exchange charges for converting dollars to euros, and an unspecified amount for "three guys" to pay for "bumper stuff for their cars."

41. None of the "use cases" for Athena's Bitcoin ATM services described in Athena's public statements require or contemplate large deposits of cash in a single transaction, such as the $9,900, $10,000, $20,800, or $34,100 deposits accepted by Athena's Bitcoin ATMs in furtherance of the theft of named Plaintiffs' money.

---

[3] Such remittances have been reported as the most common use of Bitcoin ATMs generally. Federal Reserve Board Research Briefing, *The Controversial Business of Cash-to-Crypto Bitcoin ATMs,* at 2 (August 30, 2023). www.kansascityfed.org/research/payments-system-research -briefings/the-controversial-business-of-cash-to-crypto-bitcoin-atms/ (last visited May 29, 2025)

### ii. Athena's Knowledge of the Regular Use of Its Bitcoin ATMs Services
for Impersonation Scams

42. In January 2017, less than a year and half after installing its first Bitcoin ATM, Athena began posting "Scam Alerts" on its website, warning that its Bitcoin ATMs were being used as payment portals in criminal fraud schemes.

43. Later in 2017, Athena also began displaying "Scam Warning" notices on the screens of its ATMs.

44. During a March 28, 2017 conference presentation, Athena reported detecting various scams at its Bitcoin ATMs, including "Elderly Fraud," "IRS Payment Fraud," and, as described by then-Chief Compliance officer Gilbert Valentine, impersonation scams in which the criminals "pose…as female commissioned officers of the military" to attempt to deceive people into sending money via Athena Bitcoin ATMs for non-existent luxury cars. **Exhibit B** (screenshot of "Fraud Detection" slide from presentation); video at [www.youtube.com/watch?v=H4Kg ClyKsCI](www.youtube.com/watch?v=H4KgClyKsCI). "Operating a Bitcoin ATM Business: Tales from the Front Line," (Fraud Detection discussion at [00:12:19 – 00:14:42]).

45. During the March 28, 2017 presentation, Athena also reported that it had taken measures to detect and "thwart" such scams:

> Athena Customer Service and Compliance has thwarted 10's of thousands of dollars worth of online fraud returning customers >$30 worth of refunds in the last six months.

Exhibit B.

46. By March 28, 2017 the company had "implemented a system" to "freeze" transactions by first time users, pending Athena's direct telephone and e-mail communication with the user to screen for possible scams, as described by Athena's then-Chief Compliance Officer, Gilbert Valentine:

I'm pretty proud of what we've done in the last couple months. We implemented a system by which we vetted new people - new to Bitcoin - that were trying to buy Bitcoin through our ATM network and they were going to basically send it to Saint Petersburg, Russia.

We have a system in place by which we freeze transactions for first time buyers. We then call them, interview them by phone. We… write back and forth on e-mail. In the last six weeks, I'm able to return $30,000 worth of funds to people who otherwise would have been completely screwed.

www.youtube.com/watch?v=H4KgClyKsCI [00:12:46 – 00:13:11]

47. In 2022, Athena updated its website to include warnings of new and continued scams facilitated by its Bitcoin ATM services, including detailed description of the details of common impersonation scams and the psychological tactics employed by scammers, who essentially overcome their victims' will by instilling a sense of extreme fear and panic of legal and financial ruination,  and remain on the phone with them while providing detailed instructions as they withdraw money from their bank accounts, and deposit it into specified Athena Bitcoin ATMs.  Exhibit A.  www.athenabitcoin.com/avoid-these-bitcoin-scams; Exhibit D. www.athenabitcoin.com/the-most-common-bitcoin-scam-that-we-see.

48. For example, Athena acknowledges on the "Avoid these Bitcoin Scams" page that

Scammers are looking to say and do anything to convince you of an urgent need to pay through Bitcoin, and they will often "helpfully" point out nearby ATMs where you can follow their commands.

Scam artists like Bitcoin because transactions cannot be cancelled, reversed, or otherwise refunded once made.

***Athena receives numerous reports of fraud per month***, so we want to share much of what we've learned to look out for…

(emphasis added).  Exhibit A.

49. The page then describes various types of scams that have been reported to Athena, including the scam suffered by the named Plaintiffs, the "Tech Support / Bank Impersonation Scam" which Athena acknowledges to be "the most common scam of 2022!"

50. On another page of the website entitled "Fraud Alert: The most common Bitcoin scam we see!" Athena acknowledges, "Imposter scams are the most common Bitcoin [ATM] fraud that we see!" and describes the scams in chilling terms, from the victims' point of view:

> Imagine being in a panic thinking that you will be arrested or that money is about to be drained out of your bank account? Imagine having someone on the phone with you for hours making sure you obey their instructions? Thousands of people each year don't have to imagine…."

51. Athena's knowledge that its Bitcoin ATMs are regularly used to facilitate "impersonation scams" is evident not only from the continuous admissions that have appeared on its website since shortly after the company's inception, but also from the numerous news reports and other court actions calling specific instances of such scams to Athena's attention. See e.g., www.news-journalonline.com/story/news/2025/03/12/florida-woman-falls-for-bitcoin-machine-scam/80695719007/; www.coalregioncanary.com/2024/07/25/athena-bitcoin-scam-schuylkill-county-minersville-atm-machine/;) www.local10.com/news/local/2024/08/02/police-georgia-woman-impersonated-deputies-to-target-fraud-victims-with-fake-warrants/; Hoist v. Athena Bitcoin ATM, 23-cv-21905-RK-RLS (D.N.J. 2023); Carew v. Athena Bitcoin, Inc., et. al MON-L-003971-24.

52. Athena's knowledge of the "skyrocketing" use of Bitcoin ATMs to facilitate impersonation scams is further supported by the numerous, well-publicized reports of this alarming trend by federal and state financial and law enforcement agencies, most recently by the Federal Trade Commission (FTC), which in September of 2024 issued a report stating that FTC "data show that fraud losses at BTMs are skyrocketing, increasing nearly tenfold from 2020 to 2023," that

"[r]eports of losses using BTMs are overwhelmingly about government impersonation, business impersonation, and tech support scams," and that "people 60 and over were more than three times as likely as younger adults to report a loss using a BTM. In fact, more than two of every three dollars reported lost to fraud using these machines was lost by an older adult."  See www.ftc.gov/news-events/data-visualizations/data-spotlight/2024/09/bitcoin-atms-payment -portal-scammers Federal Trade Commission, September 3, 2024, "FTC Data Spotlight. Bitcoin ATMs: a payment portal for scammers."[4]

53. On September 11, 2024, in the wake of the FTC report, members of the United States Senate Banking Committee wrote to Athena (see Exhibit E) calling on the company **"to take immediate action to address troubling reports that your Bitcoin ATMs (BTMs) are contributing to widespread financial fraud against elderly Americans" and asking for information regarding "what actions Athena Bitcoin is taking to address this problem" by October 4, 2024, including whether "Athena Bitcoin limit[s] the amount an individual can deposit or transfer in a single day, week, or other period of time," whether "Athena Bitcoin hold[s] deposited and transferred funds for any period of time or take[s] any other measures to allow transactions to be reversed in the case of fraud or mistake" and whether "Athena Bitcoin insure depositors against fraud[.]"

54. To Plaintiffs' knowledge, Athena never responded to the Senators' inquiry.

---

[4]  See also, Federal Bureau of Investigation (FBI), *The FBI Warns of Fraudulent Schemes Leveraging Cryptocurrency ATMs and QR Codes to Facilitate Payment* (November 4, 2021) ("The FBI has seen an increase in scammers directing victims to use physical cryptocurrency ATMs and digital QR codes to complete payment transactions.") www.ic3.gov/PSA/2021/PSA211104; New Jersey Commission of Investigation, *Bitcoin ATMs: Scams, Suspicious Transactions, and Questionable Practices at Cryptocurrency Kiosks* (February 2021) (Commission's investigation "of records subpoenaed from 30 businesses that operated or were associated with…cryptocurrency kiosks in New Jersey over the last five years" found "numerous instances where unwitting victims were duped into sending cryptocurrency to unknown wallets through the machines, including some schemes that resulted in the loss of tens of thousands of dollars.") www.nj.gov/sci/pdf/SCI%20Bitcoin%20Report.pdf

### iii. Athena's Acknowledged Capability to Detect and "Freeze" Scam Transactions and its Inexcusable Failure to Do So.

55. Despite knowing since at least 2017 that its Bitcoin ATM kiosks have regularly and foreseeably been used by criminals to facilitate impersonation scams, Athena has failed to maintain reasonable, effective measures to remediate the extreme danger that its Bitcoin ATMs have posed to seniors and other vulnerable populations.

56. Athena is capable of implementing reasonable, effective, and sufficient safeguards that would eliminate the use of its Bitcoin ATM services to facilitate impersonation scams, but has chosen not to adopt such measures, apparently because doing so would deprive Athena of considerable profit it gains from transaction fees charged for high-value illicit transfers, in comparison to the legitimate small-value "use cases" identified by Athena, such as cross-border remittances and online purchases.

57. In fact, Athena has acknowledged that in 2017, it had already "implemented a system" to prevent scams at its ATMs "by which we freeze transactions for first time buyers. We then call them, interview them by phone [and] write back and forth on e-mail" to screen for possible scams. Within six-weeks of implementing this "system," Athena was able "to return $30,000 worth of funds" to scam victims "who otherwise would have been completely screwed"   www.youtube.com/watch?v=H4KgClyKsCI, at [00:12:46 – 00:13:11] (speech delivered by Athena's then-Chief Compliance Officer, Gilbert Valentine on March 28, 2017).

58. In July 2019, Athena reported that it had implemented a daily transaction limit of $9,500 and heightened security measures for transactions exceeding $3,000, as part of its financial crime prevention regulation compliance policy., https://www.youtube.com/watch?v=2_hyMd-26I8 at [00:11:13 – 00:11:49] (interview of Gilbert Valentine and Eric Gravengaard, July 2, 2019).

59. Despite its express knowledge of the regular and foreseeable use of its Bitcoin ATM kiosks as instrumentalities in impersonation scams, Athena has failed to implement design, operational, or policy changes that would preclude such use, for example, by detecting and intervening in suspicious transactions, placing strict limits on the amounts of deposits by new users for an introductory period, placing reasonable limits on total daily deposits for all users, implementing policies and mechanisms to confirm that the wallet belongs to the depositor, and implementing a reasonable holding period before the cash is converted to Bitcoin and "irreversibly" transferred.

60. Instead of taking effective, responsible measures to mitigate the danger posed by its Bitcoin ATM services, Athena has limited its "efforts" to passive measures, such as displaying warnings about impersonation scams and requiring users to check boxes acknowledging the warnings, which Athena knows have been ineffective at stopping the regular and foreseeable use of its Bitcoin ATM services to facilitate scams.

### iv. Athena's Facilitation of the Theft of $9,900 from Plaintiff Rachel Gnadinger

61. On February 5, 2025, Plaintiff Rachel Gnadinger called a number she believed to be a Google support number to attempt to resolve a problem with her account.

62. The purported Google representative told Ms. Gnadinger that her Google account, PNC Bank account, and cell phone had been hacked, and her accounts were used by someone to purchase a pornhub.com subscription for $150 and attempt to upload child pornography, and that there was a $9,900 preauthorization on her account for a cryptocurrency purchase.

63. The Google representative advised that he would initiate a three-way call with a PNC Bank representative to resolve the unauthorized charges.

64. Ms. Gnadinger then spoke with a purported PNC representative who told her that the $9,900 charge for the cryptocurrency purchase could not be cancelled because was pre-authorized, and that to resolve the issue, Ms. Gnadinger would need to make a duplicate transaction by withdrawing $9,900 from the account and depositing it into an Athena Bitcoin ATM at a Shell gas station at 1659 Saint Georges Ave, Rahway, New Jersey.

65. When Ms. Gnadinger expressed doubt and objected to this course of action, the purported PNC representative advised that she was forwarding the call to an FTC agent for confirmation of the soundness of her instructions.

66. Ms. Gnadinger then spoke with a purported FTC agent, who confirmed the purported PNC representative's account of the situation and instructions.  During the call, the connection failed, and the purported FTC agent called back using a number that identified on caller ID as "US Government."

67. Ms. Gnadinger then stayed on the phone with the purported FTC agent, as he instructed her to drive to a local PNC branch, withdraw $9,900 in cash, and deposit it into an Athena Bitcoin ATM located in a gas station shop operated by Defendant Rahway Shell, at 1659 Saint Georges Ave, Rahway, New Jersey.

68. Ms. Gnadinger deposited the $9,900 into Athena's Bitcoin ATM in a single transaction, and provided the purported FTC agent with a photograph of a QR code displayed on the screen at his instruction.

69. The following day, Ms. Gnadinger learned that she had been scammed when she called the real FTC after the imposter FTC agent failed to call her as scheduled.

70. She then reported the incident to the FTC and the Woodbridge Township Police Department.

71. Ms. Gnadinger called and e-mailed Athena numerous times to report the incident and request the return of her money, but Athena has not returned her calls or responded to her messages.

72. At the time the cash stolen from Ms. Gnadinger was accepted and remained inside Athena's Bitcoin ATM, but before Athena transferred the money as Bitcoin to the scammers' wallet, Athena possessed or had access to the following information:

    a. The $9,900 was far in excess of the cost of any of the legitimate "use cases" identified by Athena for its Bitcoin ATM in public statements.

    b. The $9,900 was deposited by a first-time user with no prior transactions with Athena.

    c. Athena's Bitcoin ATM services have been used on numerous occasions to facilitate impersonation scams, which have involved abnormally large transactions made by first-time users.

    d. The $9,900 transaction required an individual to enter a Shell gas station shop with $9,900 in cash, take out the cash, and insert it one bill at a time while standing at Athena's Bitcoin ATM kiosk in public view;

    e. The $9,900 was in excess of the maximum $9,500 transaction threshold identified by Athena in public statements;

    f. The $9,900 was just under the enhanced reporting thresholds imposed by anti-money laundering regulations applicable to registered money services business;

73. At the time the cash stolen from Ms. Gnadinger was accepted and remained inside Athena's Bitcoin ATM, but before Athena transferred money as Bitcoin to the scammers' wallet, Athena knew or should have known that the money was derived from criminal activity.

74. At the time the cash stolen from Ms. Gnadinger was accepted and remained inside Athena's Bitcoin ATM, but before Athena transferred money as Bitcoin to the scammers' wallet, Athena knew that there was a high probability that the money was derived from criminal activity.

75. At the time the cash stolen from Ms. Gnadinger was accepted and remained inside Athena's Bitcoin ATM, but before Athena transferred money as Bitcoin to the scammers' wallet, a reasonable person with access to the information possessed by or accessible to Athena would believe the money was derived from criminal activity.

76. Athena nevertheless proceeded to process the transaction by taking its approximate 25% cut of the stolen money, and transferring the remainder as Bitcoin to the scammer's wallet.

### v. Athena's Facilitation of the Theft of $69,100 from Plaintiff Madeline McCausland

77. Plaintiff Madeline McCausland is an 80-year-old woman who lives in Runnemede, New Jersey.

78. On June 13, 2024, Ms. McCausland received a text message stating that there was a problem with her Netflix account and advising her to call customer support at a telephone number provided in the message to avoid termination.

79. Ms. McCausland called the number and spoke with a purported Netflix representative, who told her that she had been the victim of identity theft, as there were multiple people using her account, and that due to the seriousness of the situation, she was being transferred to a federal Treasury agent for further briefing.

80. Ms. McCausland was then transferred to a person who identified himself as Ron Jefferson, Chief Investigation Officer for the U.S. Department of Treasury, who convinced Ms. McCausland that she was in grave legal jeopardy and danger as a result of theft of her identity.

81. The purported Treasury agent convinced Ms. McCausland that in order to avoid arrest and prosecution for actions attributed to her as a result of the identity theft, including drug trafficking and international money laundering, she would have to be given a new identity and enter the witness protection program.

82. The purported Treasury agent convinced Ms. McCausland that in order for her to be given a new identity and accepted into the witness protection program, she would need to follow all instructions he provided.

83. The purported Treasury agent convinced Ms. McCausland that until she was given a new identity and accepted into the witness protection program, she would remain under "house arrest" and was not to discuss the situation with family members or anyone else.

84. On June 13, 2024, at the direction of the purported Treasury agent who remained on the phone with her, Ms. McCausland drove to a branch of her bank, TD Bank, withdrew $10,000 in $20 bills, and deposited into an Athena Bitcoin ATM at One Stop Shoppe convenience store at 980 Creek Rd. Bellmawr. New Jersey, in a single transaction.

85. On June 14, 2024, at the direction of the purported Treasury agent who remained on the phone with her, Ms. McCausland drove to TD Bank, withdrew cash totaling $25,000, and deposited into the Athena Bitcoin ATM at One Stop Shoppe in Bellmawr, New Jersey in $5,000 transaction and two $10,000 transactions.

86. On June 18, 2024, at the direction of the purported Treasury agent who remained on the phone with her, Ms. McCausland drove to TD Bank, withdrew $35,000 and deposited $34,100 into the Athena Bitcoin ATM at One Stop Shoppe in Bellmawr, New Jersey, in a single transaction,. She attempted to deposit the entire $35,000 as she had been instructed, but the machine would not accept some of the bills, totaling $900.

87. Ms. McCausland, who was 79 years old on June 18, 2024 and required the aid of a cane to walk, was exhausted, in substantial pain, and nearly collapsed during the time it took for her to insert $34,100 into Athena's Bitcoin ATM, one bill at a time.

88. On June 26, 2024, after realizing that the purported Treasury agent was no longer communicating with her, Ms. McCausland drove to the One Stop Shoppe in Bellmawr, New Jersey to attempt to withdraw the $69,100 she deposited into the machine.

89. When she was told by the store owner that the ATM does not dispense cash, she asked him to call the police.  When he refused, Ms. McCausland called 911, and a Bellmawr Police officer responded.

90. The police officer advised Ms. McCausland that she had been the victim of a scam, and notified Ms. McCausland's adult children, who assisted her in reporting the theft to the Runnemede Police Department and the FBI.

91. On June 26, 2025, Ms. McCausland called Athena customer service to report the theft.  Athena did not offer a refund or any other remedy.

92. At the time the cash stolen from Ms. McCausland was accepted into and remained inside Athena's Bitcoin ATM, but before Athena transferred approximately 75% of the money as Bitcoin to the scammers' wallet, Athena possessed or had access to the following information:

   a. The deposits of $10,000, $25,000, and $34,100 were far in excess of the cost of any of the legitimate "use cases" for its Bitcoin ATM services;

   b. The deposits of $10,000, $25,000, and $34,100 were deposited by a new Athena customer with no prior history of purchasing Bitcoin from Athena.

c. Athena's Bitcoin ATM services have been used on numerous occasions to facilitate impersonation scams, which have involved abnormally large transactions made by first-time users.

d. The transactions, especially the one for $34,100, required a 79-year-old woman to enter a convenience store with very large amounts of cash, take the cash out and insert the cash, one bill at a time, while standing at Athena's ATM kiosk in public view;

e. The transactions were far in excess of the $9,500 daily transaction limit Athena had previously implemented in 2019.

f. The $10,000, $25,000, and $34,100 triggered Athena's enhanced reporting and verification thresholds imposed by anti-money laundering regulations applicable to registered money services business;

93. At the time the cash stolen from Ms. McCausland was accepted and remained inside Athena's Bitcoin ATM, but before Athena transferred money as Bitcoin to the non-custodial wallet, Athena knew or should have known that the money was derived from criminal activity.

94. At the time the cash stolen from Ms. McCausland was accepted and remained inside Athena's Bitcoin ATM, but before Athena transferred money as Bitcoin to the non-custodial wallet, Athena knew that there was a high probability that the money was derived from criminal activity.

95. At the time the cash stolen from Ms. McCausland was accepted and remained inside Athena's Bitcoin ATM, but before Athena transferred money as Bitcoin to the non-custodial wallet, a reasonable person with access to the information possessed by or accessible to Athena would believe the money was derived from criminal activity.

96. Athena nevertheless proceeded to process the transactions by taking its 25% cut of the stolen money (amounting to approximately $17,500) and transferring the remainder as Bitcoin to the unsecured wallet to be harvested by the scammers.

**vi. Athena's Facilitation of the Theft of $25,800 from Plaintiff Joanne Nebus-Horning**

97. Plaintiff Joanne Nebus-Horning is a 74-year-old retiree who resides in Aberdeen Township, New Jersey.

98. On March 13, 2025, Ms. Nebus-Horning received a call from a purported Apple representative, who advised her that her computer had been hacked, and that her credentials and accounts with all of her banks had been compromised.

99. The purported Apple representative also told her that various criminal transactions had been conducted under her name and accounts, including purchases of child pornography and illegal purchases of cryptocurrency.

100. She was then transferred to another person who identified himself as a Bank of America fraud manager.

101. The purported Bank of America fraud manager told Ms. Nebus-Horning that he detected a total of four unauthorized transactions, and was able to cancel two of them, but the other two totaling $25,800 could not be cancelled until it was confirmed that she was not responsible for the illegal purchases, and the only way to protect $25,800 from the pending charges was to withdraw the funds and deposit them into a "proxy" Bitcoin account at an Athena Bitcoin ATM where it would be held "until her name was cleared."

102. The purported Bank of America fraud manager convinced Ms. Nebus-Horning that an FTC special agent was monitoring their calls, and if she did not follow his instructions, she could face possible arrest for the hacker's purchase of child pornography.

103.    On March 13, 2025, at the direction of the purported Bank of America fraud manager, who remained on the phone with her, Ms. Nebus-Horning drove to two Bank of America branches, withdrew a total of $25,800 deposited the cash into the Athena Bitcoin ATM in the Exxon gas station shop at 2055 NJ-35, Holmdel, New Jersey, in one transaction of $5,000 and another transaction of $20,800.

104.    On March 14, 2025, Ms. Nebus-Horning realized that she had been scammed, and reported the incident to the Aberdeen Police Department and the FBI.

105.    On March 21, 2025, the Aberdeen Police Department contacted Athena to report the incident.

106.    In response, Athena offered to return its transaction fee, but not the remainder of the money stolen from Ms. Nebus-Horning.

107.    At the time the cash stolen from Ms. Nebus-Horning was accepted into and remained inside Athena's Bitcoin ATM, but before Athena transferred the money as Bitcoin to the scammers' wallet, Athena possessed or had access to the following information:

a.    The deposits of $20,800 and $5,000 were far in excess of the cost of any of the legitimate "use cases" identified by Athena for its Bitcoin ATM in public statements;

b.    The deposits of $20,800 and $5,000 were made by a first-time user with no prior transactions with Athena;

c.    Athena's Bitcoin ATM services have been used on numerous occasions to facilitate impersonation scams, which have involved abnormally large transactions made by first-time users.

d.   The deposits totaling $25,800 required a 74-year-old-woman to enter an Exxon gas station shop with dangerously large amounts of cash, take out the cash, and insert it one bill at a time while standing at Athena's Bitcoin ATM kiosk in public view;

e.   The $20,800 transaction was far in excess of the maximum $9,500 transaction threshold identified by Athena in public statements;

f.   The $20,800 transaction triggered Athena's enhanced reporting and verification thresholds imposed by anti-money laundering regulations applicable to registered money services business;

108.   At the time the cash stolen from Ms. Nebus-Horning was accepted and remained inside Athena's Bitcoin ATM, but before Athena transferred money as Bitcoin to the non-custodial wallet, Athena knew or should have known that the money was derived from criminal activity.

109.   At the time the cash stolen from Ms. Nebus-Horning was accepted and remained inside Athena's Bitcoin ATM, but before Athena transferred money as Bitcoin to the non-custodial wallet, Athena knew that there was a high probability that the money was derived from criminal activity.

110.   At the time the cash stolen from Ms. Nebus-Horning was accepted and remained inside Athena's Bitcoin ATM, but before Athena transferred money as Bitcoin to the non-custodial wallet, a reasonable person with access to the information possessed by or accessible to Athena would believe the money was derived from criminal activity.

111.   Athena nevertheless proceeded to process the transactions by taking its approximate 25% cut of the stolen money and transferring the remainder as Bitcoin to the non-custodial wallet, to be harvested by the scammers.

**Allegations Relating to Athena's Possession of the Plaintiff's Stolen Property**

112.    After the theft of the named Plaintiffs' and putative class members' cash, Athena retained

possession of the stolen cash and converted it to its own use, rather than turning it over to the

police or Plaintiff.

113.    Athena has maintained a policy and practice of failing to turn over the stolen cash to the

police or Plaintiff despite having been notified of the theft.

114.    Athena has maintained a policy and practice of retaining and failing to turn over stolen

cash to the police or victims after having been notified that victims deposited the cash into

Athena's Bitcoin ATMs under a mistake as to the identity of the recipient.

115.    Athena has maintained a policy and practice of retaining cash inserted into its Bitcoin

ATMs as a result of impersonation scams rather than returning it to the victims, based on

Athena's position, stated in the written warnings given at its Bitcoin ATMs, that all cash

deposited into the machines is "irreversibly" transferred as Bitcoin to the designated wallet.

116.    Athena's statements that cash deposits at its Bitcoin ATMs are irreversible is misleading,

as the cash itself remains physically inside the kiosk, and thus in Athena's possession and

control.

117.    Athena's misrepresentations are particularly apparent with respect to the substantial

portion of the stolen cash that was retained by Athena as a fee for its "services" and thus not

transferred to the scammer, irreversibly or otherwise.

## <u>CLASS ALLEGATIONS</u>

118.    This action is brought and may properly proceed as a class action, pursuant to the

provisions of New Jersey Court Rule 4:32.

119.    Plaintiffs seek certification of a Class, initially defined as follows:

Any person who, during the proposed class period, completed a cash-to-Bitcoin transaction at an Athena Bitcoin ATM in New Jersey with a cash purchase price exceeding $9,500 within 14 days after registering the user account used for the transaction, and who, according to Athena Bitcoin, Inc.s records, subsequently reported to Athena, law enforcement, or anyone else, that the transaction was part of an impersonation scam.

As used in the above class definition, the following terms and phrases have the following meanings:

"Proposed class period" is the period beginning six years prior to the filing of this Complaint and ending on the date an order certifying the proposed class is entered, if any.

"Transaction at an Athena Bitcoin ATM in New Jersey with a purchase price exceeding $9,500" includes two or more transactions in a single day with an aggregate purchase price exceeding $9,500, provided all transactions were at Athena Bitcoin ATMs in New Jersey.

"Impersonation scam" means scams of the type generally described under the headings on the Athena Bitcoin website at https://athenabitcoin.com/avoid-these-bitcoin-scams/ (Exhibit A), without limiting the term to the specific companies (Microsoft, Apple, and Google) and details ("pop-up often accompanied by a loud warning sound") used as examples.

Excluded from the class is any person who, according to Athea's records, signed a release of claims against any of the Defendants prior to the date of filing and service of this Complaint.

120.   The members of the Class for whose benefit this action is brought is so numerous that joinder of all members is impracticable.

121.   There are questions of law and fact common to the members of the Class that predominate over questions affecting only individuals. These common questions include:

122.   Plaintiffs' claims are typical of the claims of the members of the Class which it represents because all such claims arise out of the same policies, practices, and conduct, and the same or similar documents used by Defendants in their dealings with Plaintiff.

123.   Plaintiffs have no interests antagonistic to those of the Class.

124.   The Class, of which Plaintiffs are members, is readily identifiable.

125.   Plaintiffs will fairly and adequately protect the interests of the Class and have retained competent counsel experienced in the prosecution of consumer litigation. Proposed Class

Counsel has investigated and identified potential claims in the action. Proposed Class Counsel has a great deal of experience in handling class actions, other complex litigation, and claims of the type asserted in this action.

126.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. While the economic damages suffered by the individual members of the Class are significant, the amount is modest compared to the expense and burden of individual litigation.

127.   The questions of law or fact common to the members of the Class predominate over any questions affecting only individual members.

128.   Defendants have acted, or refused to act, on grounds generally applicable to Plaintiffs and all class members, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

129.   A class action will cause an orderly and expeditious administration of the claims of the Class, and will foster economies of time, effort and expense.

130.   Plaintiffs do not anticipate any difficulty in the management of this litigation.

## CAUSES OF ACTION

### COUNT ONE: New Jersey Consumer Fraud Act

131.   The Consumer Fraud Act (CFA), at N.J.S.A. 56:8-2, prohibits "[t]he act, use or employment by any person of any commercial practice that is unconscionable or abusive, deception, fraud, false pretense, false promise [or] misrepresentation… in connection with the sale or advertisement of any merchandise… or with the subsequent performance."

132.   The CFA defines "sale.of any merchandise" broadly, and the term includes the Defendants' sale of cryptocurrency exchanges and transfers through Athena's Bitcoin ATM machines.

133.    N.J.S.A. 56:8-19 provides for a private right of action for treble damages, equitable relief, and reasonable attorney's fees and costs to "[a]ny person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act."

134.    The plain language of the CFA does not require privity between "any person" who violates the Act and the "any person" who suffers "ascertainable loss…as a result of" the violation.

135.    Under CFA precedents, a sellers' violation of their legal duties under other laws can constitute and serve as evidence of an abusive or unconscionable commercial practice under N.J.S.A. 56:8-2.

136.    Defendants Athena Bitcoin, Inc Matias Goldenhörn, Sam Nazzaro, Eric Gravengaard, and Gilbert Valentine engaged in unconscionable commercial practices, abusive commercial practices, and/or deception in violation of the CFA at N.J.S.A. 56:8-2, including, without limitation:

   a.   Routine approval of transactions and acceptance of cash payments by first-time users in excess of $9,500 at its Bitcoin ATMs, which a reasonable person would believe to be money derived from theft by deception or other criminal activity, and by foregoing reasonable measures to suspend such transactions pending reasonable inquiry (as Athena reported having previously implemented).

   b.   Failure and refusal to implement appropriate and sufficient checks and procedures to intervene, mitigate, and/or deter the use of the Athena Bitcoin ATMs in the subject scams;

   c.   Discontinuation of appropriate and sufficient checks and procedures to intervene, mitigate, and/or deter the use of the Athena Bitcoin ATMs in the subject scams;

d.  Failure to intervene, and/or deter the transactions occurring in the Convenience Store Defendants' establishments when it was apparent that they were suspicious and indicative of scams;

e.  Routine retention of the portion of the stolen cash that Athena kept as a fee (approximately 25% of the total cash deposited, in the Plaintiffs' scams), when a reasonable person would believe to be money derived from theft by deception or other criminal activity;

f.  Routine retention of the portion of the stolen cash that Athena kept as a fee (approximately 25% of the total cash deposited, in the Plaintiffs' scams), even after receiving notice that the cash was stolen from Plaintiffs by unknown scammers;

g.  Routine retention of the portion of the stolen cash that Athena kept as a fee (approximately 25% of the total cash deposited, in the Plaintiffs' scams), when a reasonable person would believe to be money derived from theft by deception or other criminal activity.

h.  Financial Facilitation of Criminal Activity, N.J.S.A. 2C:21-25(a) ("A person is guilty of a crime if the person… transports or possesses property… which a reasonable person would believe to be derived from criminal activity.")

i.  Theft of property lost, mislaid, or delivered by mistake, N.J.S.A. 2C:20-6 ("A person who comes into control of property of another that he knows to have been…delivered under a mistake as to the nature or amount of the property or the identity of the recipient is guilty of theft if, knowing the identity of the owner and with purpose to deprive said owner thereof, he converts the property to his own use.");

j.  Receiving stolen property, N.J.S.A. 2C:20-7;

k. Trafficking in stolen property, N.J.S.A. 2C:20-7.1;

l. Deceptive business practices, N.J.S.A. 2C:21-7(h)("A person commits an offense if in the course of business he… makes a false or misleading written statement for the purpose of obtaining property or credit" such as the Defendants numerous written statement falsely and misleadingly stating that all cash deposited into Athena Bitcoin ATMs by scam victims are "irreversible")

137.   Plaintiff and those similarly situated have suffered ascertainable loss from Defendants' violations of the CFA.

138.   Plaintiff and all others similarly situated are thus entitled to all appropriate legal and equitable relief, an award of treble their damages, plus attorney's fees, and costs pursuant to N.J.S.A. 56:8-19.

### COUNT TWO: Negligence / Gross Negligence / Recklessness

139.   Prior to the theft of Plaintiffs' money by the unknown scammers as described herein, Defendant Athena, Defendant Goldenhörn, Defendant Nazzaro, Defendant Gravengaard, Defendant Valentine, and the Convenience Store Defendants were expressly aware of the regular and foreseeable use of Athena Bitcoin ATMs as instrumentalities in impersonation scams.

140.   Prior to the theft of Plaintiffs' money by the unknown scammers as described herein, Defendants Rahway Shell, Holmdel Exxon, One Stop Shoppe,, and John Doe Convenience Stores (collectively, the "Convenience Store Defendants") knew or should have known of the regular and foreseeable use of Athena's Bitcoin ATM's as instrumentalities in impersonation scams against elderly and other vulnerable individuals, in part because the kiosks displayed warnings of such fraudulent activity.

141.    Said Defendants had a duty to Plaintiffs and the putative Class to take reasonable measures to prevent Athena Bitcoin ATMs from continuing to be regularly used by criminals as instrumentalities in impersonation scams.

142.    Said Defendants breached their duties to Plaintiff and the Class by negligently, recklessly, and knowingly failing to implement checks and procedures both at its ATMs and internally that would effectively intervene, mitigate, or deter the use of its ATMs in scams such as the one in this case.

143.    Each Convenience Store Defendant owns and maintains control over the convenience store at which the Athena ATMs are located.

144.    Plaintiff and the putative Class members are deemed to be invitees when they entered the convenience stores, and the Convenience Store Defendants therefore owed them the high duty of care, requiring the store Defendants to maintain the premises in a safe condition and take active steps to ensure their safety while on the property.

145.    The transactions at issue in this case were atypical and suggestive of a scam and the Convenience Store Defendants had a duty to inquire, intervene, and/or deter the transactions.

146.    The thefts would have been detected and deterred if the Convenience Store Defendants' had not breached their duty of care owed to the Plaintiff and putative Class members.

147.    The Plaintiffs and the putative Class members were damaged by all Defendants' breaches described above, in the amount of the cash that was stolen from them using Athena Bitcoin ATMs.

148.    Defendants' negligent, reckless, and knowing failure and refusal to implement appropriate and sufficient checks and procedures to intervene, mitigate, or deter the use of the ATMs

described above in the subject scams was a direct and proximate cause of Plaintiff and Class Members damages.

**COUNT THREE: Civil Action for Possession of Stolen Property (N.J.S.A. 2C:20-20)**

149.    N.J.S.A. 2C:20-20 creates a civil right of action for triple damages, reasonable attorney's fees, and costs for "[a]ny person damaged in his business or property by reason of a violation of section 7 of this...act, " which refers N.J.S.A. 2C:20-7 and N.J.S.A. 2C:20-7.1, criminal statutory provisions prohibiting various theft related activities, including receiving stolen property (N.J.S.A. 2C:20-7) and "trafficking" in stolen property (N.J.S.A. 2C:20-7.1(b)).

150.    "Trafficking" as used in N.J.S.A. 2C:20-7-1(b) is broadly defined and includes the following conduct: "1. [t]o sell, transfer, distribute, dispense or otherwise dispose of property to another person, or 2. to buy, receive, possess, or obtain control of or use property, with intent to sell, transfer, distribute, dispense or otherwise dispose of such property to another person." N.J.S.A. 2C:20-1.

151.    In a civil action under N.J.S.A. 2C:20-20, "[a]ll persons who have possessed or obtained control of stolen property are liable as principals and may be sued jointly or severally, whether or not possession or control was joint," subject to a right to sue the principal for contribution. N.J.S.A 2C:20-20(b)(1)(emphasis added).

152.    The unidentified scammers who deceived Plaintiffs and the putative class members into depositing their cash into Athena's Bitcoin ATMs violated N.J.S.A. 2C:20-7 and N.J.S.A. 2C:20-7.1 by, without limitation, receiving stolen property and trafficking in stolen property.

153.    Athena and its past and current officers responsible for these policies and practices violated N.J.S.A. 2C:20-7 and N.J.S.A. 2C:20-7.1 by, without limitation, receiving stolen property and trafficking in stolen property.

154.    The Plaintiffs and putative class members were damaged by reasons of these violations of N.J.S.A. 2C:20-7 and N.J.S.A. 2C:20-7.1 committed by the unidentified scammer, Athena, or both.

155.    The Plaintiffs and putative class members suffered damages in the amount of the cash  that was stolen from her by the scammer, facilitated by Athena's Bitcoin ATMs services.

156.    In the alternative, Plaintiffs and the putative class members suffered damages in the amount of the portion of the stolen money that Athena retained as its "fee" and continued to retain after Athena learned the money was stolen.

The Plaintiffs and putative class members are therefore entitled to a judgment against Athena for triple the money that was stolen from them, reasonable attorney's fees, and costs, pursuant to N.J.S.A. 2C:20-20.

### COUNT FOUR: New Jersey Racketeer Influenced and Corrupt Organizations Act (NJRICO) Claim Predicated on Financial Facilitation of Criminal Activity (N.J.S.A. 2C:21-25(a))

157.    N.J.S.A. 2C:21-25(a) provides, "A person is guilty of a crime <u>if the person… transports or possesses property</u> known or <u>which a reasonable person would believe to be derived from criminal activity</u>." (emphasis added).

158.    This provision has been construed as criminalizing possessing or "transporting money under circumstances akin to ordinary criminal negligence…" *Amaya v. New Jersey*, 766 F. Supp. 2d 533, 539-40 (D.N.J. 2011), *aff'd sub nom. Kress v. New Jersey*, 455 Fed. Appx. 266 (3d Cir. 2011)(holding statute applies to money transport business whose business is structured "to facilitate potentially criminal activity while remaining willfully blind.")

159.    The New Jersey Racketeer Influenced and Corrupt Organizations Act ("NJRICO") provides, at N.J.S.A. 2C:41-2(c) that "[i]t shall be unlawful for any person employed by or

associated with any enterprise engaged in or activities of which affect trade or commerce to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity..."

160.    NJRICO defines "racketeering activity" to include, inter alia, "fraudulent practices and all crimes defined in chapter 21 of Title 2C of the New Jersey Statutes."

161.    Defendants Athena Bitcoin, Inc Matias Goldenhörn, Eric Gravengaard, and Gilbert Valentine are each "persons" as defined by NJRICO, N.J.S.A. 2C:41-1(b).

162.    Defendants Athena Bitcoin, Inc Matias Goldenhörn, Sam Nazzaro, Eric Gravengaard, and Gilbert Valentine are, collectively, an "enterprise" as defined by NJRICO, at N.J.S.A. 2C:41-1(c), with respect to their policies and practices relating to possessing and retaining stolen property, as alleged herein.

163.    Defendant Athena Bitcoin, Inc. is, independently, an "enterprise" as defined by NJRICO, at N.J.S.A. 2C:41-1(c), with respect to its policies and practices relating to possessing or transporting property which a reasonable person would believe to be derived from criminal activity.

164.    The Defendants have engaged in "racketeering activity" by possessing or transporting property which a reasonable person would believe to be derived from criminal activity, in violation of N.J.S.A. 2C:21-25(a).

165.    At the time the cash stolen from the named Plaintiffs was accepted and remained inside Athena's Bitcoin ATMs, but before Athena transferred the money as Bitcoin to the scammers' wallets, a reasonable person with access to the information possessed by or accessible to Athena would believe the money was derived from criminal activity.   The information possessed or accessible by Athena included, without limitation, the following:

a.  The cash deposited was far in excess of the cost of any of the legitimate "use cases" identified by Athena for its Bitcoin ATM in public statements;

b.  The very large cash deposits (including single-transaction deposits of $34,100, $20,800, $10,000, and 9,900, and $5,000) were made by new users with no prior transactions with Athena;

c.  Athena has admitted since shortly after its inception that its Bitcoin ATM services are frequently used to facilitate impersonation scams, which have involved abnormally large transactions made by first-time users.

d.  The $34,100 transaction entailed an 79-year-old woman travelling to a convenience store with a dangerously large amount of cash and inserting it, one bill at a time, while standing at Athena's Bitcoin ATM kiosk in public view;

e.  The deposits totaling $25,800 entailed a 74-year-old-woman travelling to an Exxon gas station shop with dangerously large amounts of cash and inserting it, one bill at a time, while standing at Athena's Bitcoin ATM kiosk in public view;

f.  The transactions were far in excess of the maximum $9,500 transaction threshold identified by Athena in public statements;

g.  The $9,900 transaction entailed a woman travelling to a convenience store with a dangerously large amount of cash and inserting it, one bill at a time, while standing at Athena's Bitcoin ATM kiosk in public view;

h.  The transaction triggered Athena's enhanced reporting and verification thresholds imposed by anti-money laundering regulations applicable to registered money services businesses.

166.    The Defendants have engaged in "racketeering activity" by acting with criminal negligence in possessing or transporting property which a reasonable person would believe to be derived from criminal activity, in violation of N.J.S.A. 2C:21-25(a).

167.    The Defendants have engaged in "racketeering activity" by acting with by transporting property which a reasonable person would believe to be derived from criminal activity, in violation of N.J.S.A. 2C:21-25(a).

168.    The Defendants have engaged in "racketeering activity" by acting with by transporting property which a reasonable person would believe to be derived from criminal activity, in violation of N.J.S.A. 2C:21-25(a).

169.    Defendant Athena engaged in activities, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity, including violations of N.J.S.A. 2C:21-25(a) on at least two occasions within the 10 years of filing of this action, and therefore engaged "directly or indirectly" in "a pattern of racketeering activity" as defined by NJRICO, at N.J.S.A. 2C:41-1(d).

170.    In addition to the Defendants' racketeering activities in connection with the money stolen from the three named Plaintiffs, as alleged herein, the Defendants engaged, directly or indirectly, in the same or substantially similar activities in connection with at least two other victims of scams using Athena Bitcoin ATMs in New Jersey.  See e.g., *Hoist v. Athena Bitcoin ATM*, :23-cv-21905-RK-RLS (D.N.J. 2023); *Carew v. Athena Bitcoin, Inc., et. al MON-L-003971-24.*

171.    Plaintiff and those similarly situated have suffered harm from Defendants' violations of NJRICO in the amount the stolen cash unlawfully possessed and transported. .

172.    Plaintiff and all others similarly situated are thus entitled to all appropriate legal and equitable relief, an award of treble their damages, plus attorney's fees, and costs pursuant to N.J.S.A. 2C:41-4(c).

**COUNT FIVE: New Jersey Racketeer Influenced and Corrupt Organizations Act (NJRICO) Claim Predicated on Theft of Property Delivered by Mistake**

173.    The New Jersey Racketeer Influenced and Corrupt Organizations Act ("NJRICO") provides, at N.J.S.A. 2C:41-2(c) that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in or activities of which affect trade or commerce to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity..."

174.    Defendants Athena Bitcoin, Inc Matias Goldenhörn, Eric Gravengaard, and Gilbert Valentine are each "persons" as defined by NJRICO, N.J.S.A. 2C:41-1(b).

175.    Defendants Athena Bitcoin, Inc Matias Goldenhörn, Eric Gravengaard, and Gilbert Valentine are, collectively, an "enterprise" as defined by NJRICO, at N.J.S.A. 2C:41-1(c), with respect to their policies and practices relating to possessing and retaining stolen property, as alleged herein.

176.    Defendant Athena Bitcoin, Inc. is, independently, an "enterprise" as defined by NJRICO, at N.J.S.A. 2C:41-1(c), with respect to its policies and practices relating to possessing and retaining stolen property, as alleged herein.

177.    NJRICO defines "racketeering activity" to include, inter alia, "theft and all crimes defined in chapter 20 of Title 2C of the New Jersey Statutes" as well as "fraudulent practices and all crimes defined in chapter 21 of Title 2C of the New Jersey Statutes."

178.    By engaging in the conduct alleged herein, the Defendants have engaged in "racketeering activity," including, without limitation, the following:

    a.   Theft of property lost, mislaid, or delivered by mistake, N.J.S.A. 2C:20-6 ("A person who comes into control of property of another that he knows to have been…delivered under a mistake as to the nature or amount of the property or the identity of the recipient is guilty of theft if, knowing the identity of the owner and with purpose to deprive said owner thereof, he converts the property to his own use.");

    b.   Receiving stolen property, N.J.S.A. 2C:20-7;

    c.   Trafficking in stolen property, N.J.S.A. 2C:20-7.1;

179.    Defendant Athena engaged in activities, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity, including violations of N.J.S.A. 2C:20-6, 20-7, 20-7.1, and/or 21-7(h) on at least two occasions within the 10 years of filing of this action, and therefore engaged "directly or indirectly" in "a pattern of racketeering activity" as defined by NJRICO, at N.J.S.A. 2C:41-1(d).

180.    In addition to the Defendants' racketeering activities in connection with the money stolen from three named Plaintiffs, as alleged herein, the Defendants engaged, directly or indirectly, in the same or substantially similar activities in connection with one or more other victim of scams using Athena Bitcoin ATMs in New Jersey.  See e.g., *Hoist v. Athena Bitcoin ATM*, :23-cv-21905-RK-RLS (D.N.J. 2023); *Carew v. Athena Bitcoin, Inc., et. al* MON-L-003971-24.

181.    Plaintiffs and those similarly situated have suffered harm from Defendants' violations of NJRICO in the amount of the stolen cash unlawfully retained by Athena.

182.    Plaintiffs and all others similarly situated are thus entitled to all appropriate legal and equitable relief, an award of treble their damages, plus attorney's fees, and costs pursuant to N.J.S.A. 2C:41-4(c).

## PRAYER FOR RELIEF

Plaintiffs, on behalf of themselves and all others similarly situated, requests judgment as follows:

a.  As to all Counts, an order certifying the class for money damages under R. 4:32-1(b)(3), and appointing Plaintiffs as Class Representatives their attorneys as Class Counsel;

b.   As to Counts One (CFA), Four and Five (NJRICO), an order certifying the class for injunctive relief under R. 4:32-1(b)(2), and appointing Plaintiffs as Class Representatives their attorneys as Class Counsel;

c.  As to Count One, judgment against all Defendants, jointly and severally, for treble damages under the CFA at N.J.S.A. 56:8-19, in favor of the Plaintiffs and putative Class members, as well as an injunction prohibiting the Defendants from continuing to engage in the unlawful acts complained of herein within the State of New Jersey;

d.  As to the Count Two, a judgment against all Defendants for actual damages and against Defendants Athena Bitcoin, Inc., Matias Goldenhörn, Sam Nazzaro, Eric Gravengaard, and Gilbert Valentine, jointly and severally, for punitive damages in favor of the Plaintiffs and putative Class members;


e.  As to the Count Three, a judgment against Defendants Athena Bitcoin, Inc Matias Goldenhörn, Sam Nazzaro, Eric Gravengaard, and Gilbert Valentine, jointly and severally, for treble damages under N.J.S.A. 2C:20-20 in favor of the Plaintiffs and putative Class members;

f.  As to Counts Four and Five a judgment against Defendants Athena Bitcoin, Inc., Matias Goldenhörn, Sam Nazzaro, Eric Gravengaard, and Gilbert Valentine, jointly and severally,

for treble damages under NJRICO at N.J.S.A. 2C:41-4 in favor of the Plaintiffs and putative Class members, as well as an injunction prohibiting the Defendants from continuing to engage in the racketeering activity complained of herein within the State of New Jersey;

g.  Reasonable attorney fees and costs, pursuant to N.J.S.A. 56:8-19, N.J.S.A. 2C:20-20, N.J.S.A. 2C:41-4, or otherwise authorized by law;

h.  Pre-judgment and post-judgment interest; and

i.  All other relief as the Court deems just and equitable.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

## NOTICE TO ATTORNEY GENERAL OF ACTION

A copy of the Complaint will be mailed to the Attorney General of the State of New Jersey by e-mail within one after the filing with the Court, pursuant to N.J.S.A. 56:8-20.

## DESIGNATION OF TRIAL COUNSEL

Pursuant to R. 4:25-4, Henry P. Wolfe is hereby designated as trial counsel for the Plaintiff, in the above matter.

## CERTIFICATION

Pursuant to *R.* 4:5-1, I hereby certify that, to the best of my knowledge, the matter in controversy is not the subject of any other action pending in any court or the subject of a pending arbitration proceeding, nor is any other action or arbitration proceeding contemplated, except for the following actions against Athena Bitcoin, Inc. and related parties pending in New Jersey

federal and state courts:  *Hoist v. Athena Bitcoin ATM*, :23-cv-21905-RK-RLS (D.N.J. 2023);

*Carew v. Athena Bitcoin, Inc., et. al* MON-L-003971-24.

I further certify that I know of no party who should be joined in the action at this time.


THE DANN LAW FIRM


Dated: May 30, 2025          by:  s/ Henry P. Wolfe
                                 Henry P. Wolfe, Esq.
                                 Attorneys for the Plaintiffs and the putative Class





# Avoid these Bitcoin Scams

Read our article on the most common Bitcoin scam **here**.

Financial scams involving digital currencies like Bitcoin are a growing component of the overall fraud universe that still involves gift cards, Western Union/MoneyGram, money orders, and bank wires.

> **Scammers are looking to** <u>say and do anything</u> **to convince you of a urgent need to pay through Bitcoin, and they will often "helpfully" point out nearby ATMs where you can follow their commands.**

Scam artists like Bitcoin because <u>transactions cannot be cancelled, reversed, or otherwise refunded</u> once made.

Athena receives numerous reports of fraud per month, so we want to share much of what we've learned to look out for when it comes to Bitcoin, digital currency, and physical cash kiosks.



The Most Important Fact To Remember: Bitcoin Transactions Are Irreversible!

## Bitcoin Scams to Avoid

**Warning:** Scam artists can *spoof* or fake ANY telephone number or email address they want!

Do NOT rely upon caller ID at all to determine who is calling.

## Impersonation scam - Tech companies, Banks, and Utilities

**Tech Support / Bank Impersonation Scam**

**Utility Impersonation Scam**



Complaint Exhibit A, Page 1 of 5

Cookie Consent

**This has been the most common scam of 2022!**

**A pop-up message will appear on your computer** telling you that it has been hacked and you need to call a Microsoft (or Apple / Google) support number for assistance. The pop-up is often accompanied by a loud warning sound.

**DO NOT CALL ANY NUMBER THAT APPEARS IN A POP-UP!**

Scammers place these messages on victim's PCs and tablets in the hopes that they will call the scammer impersonating a major tech company. The scammer will often have you download remote access software that can potentially view and access anything on your PC, including bank accounts. Ultimately, the scammer's goal is to convince you that something is wrong with your bank and ask you to withdraw physical cash to "secure it" through a Bitcoin ATM. Often multiple scammers are involved in each incident impersonating the tech company and an agent from your bank.

The solution to this one is easy: **Always call out to your bank using the number on your bank statement or visit a branch of your bank in person to verify the situation!** Bank personnel will <u>never</u> call you and ask you pull out cash.

Seek professional computer repair services to remove any malware on your PC, tablet, or phone.

Someone pretending to be from your **utility company** (usually electric) will call or email you to claim you are late on a bill. They will then threaten to shut off your electric or other utility service if you don't pay immediately in bitcoin.

**Just HANG UP, take a breath, and find the number for your actual utility company who you may call for the real status of your account.**

Scammers count on you being panicked and willing to follow their direction without question. Don't talk to them and don't call any numbers they give you. Refer to your utility bill or website for actual contact information. See also: **www.utilitiesunited.org**

## Impersonation scam - Government

**Threat of Arrest and "Protect Your Savings" Scams**

A very common form of the impersonation scam is where you will receive a call supposedly from a government agency. This could be the Social Security Administration, U.S. Marshals,  FBI, Department of Homeland Security, Immigration and Customs Enforcement, local police, and more. The scammers will often tell you that you are in trouble and are about to be arrested, or that you are connected with criminal activity and you need to help them clear your name / SSN.

Regardless of the setup, the scam always ends with you taking cash out of your bank and putting it into a "government kiosk" (really a Bitcoin ATM). The perpetrators often have another scammer call you pretending to be a different person to "confirm" the fraud.

**This particularly awful fraud has impacted many…. JUST HANG UP and block the number that is calling you. Call out to or visit someone you trust, instead, for support and advice!**

Again, never send bitcoin to anyone pressuring you to do so.

**IRS Scam**

Some government scams take the form of demands from the IRS to pay debts owed. The scammer can contact you through any communications method, including phone calls. This type of scam can be potentially very costly for the victim, including a high risk for stealing sensitive personal information. The scammer may threaten you and will sometimes provide details to pay via bitcoin.

Of course, **Uncle Sam does not *yet* accept bitcoin. Never pay supposed IRS debts via an ATM!**

## Other commonly reported forms of fraud

Complaint Exhibit A, Page 2 of 5

## Money Mule Scam

- This is **any** situation where you are receiving money from someone else (physical cash, personal or cashier's checks, bank-to-bank transfers, Venmo/Paypal, bank-to-bank transfers) and purchasing bitcoin on their behalf. This *may* also involve a "cut" or fee that you get to keep yourself for your "service".

  This situation is **highly dangerous** and will subject you to further prosecution for participation in money laundering. The likely reason someone would pay *you* to purchase bitcoin for them is because they want to obscure the source of past theft, fraud, or other criminal behavior.

  **Do not help them!**

## Scams of the Heart

- **Relationship scam**: Victim believes they are in a relationship with someone they either rarely meet or never meet and is often in another country. Scammer asks them to help pay for urgent expenses, including costs of traveling to see the victim, equipment for a business, customs fees, medical bills, and so forth. Bitcoin is especially applicable here since it is often used for cross-border payments. Unfortunately, **relationship scams can go unnoticed for quite some time and result in a devastating betrayal.**

- **Grandparent scam**: Victim is contacted by a supposed relative, often a grandchild, cousin, niece, or nephew who needs bail money or is otherwise in urgent trouble. After briefly describing the problem the scammer cuts off communication except for payment instructions, intending to panic the victim. **This scam particularly impacts the elderly.** We would suggest taking your time and verifying the story with other relatives before sending any money.

## Investment Scams

*As always…*

> **If it sounds too good to be true, it almost always is!**

- **Social Media** (Facebook, Instagram, Tiktok, Twitter, Discord, Telegram, etc.): Victims are contacted by "friends" through social media platforms and told about high earnings through some investment site / app or via a particular investment advisor. The "friend" accounts are often hacked, and the scammers target everyone connected to the hacked account. Other solicitations may come through direct messages that allow one-on-one conversations. Scammers direct you to send money − often via digital currency − to a third-party or to a legitimate-looking website. You may even be able to login and track your "earnings" on this website, but the entire thing is fake. As soon as you



## Fake Income Scams

- **Check cashing scam**: This category also includes **fake jobs or interviews.** Someone remote will offer to pay you via check (sometimes other forms) and expect you to send bitcoin to another destination for some believable reason. Excuses include sending money to clients, purchasing a wardrobe, or paying for transportation. Not only is this potentially money laundering, but most likely you will see the original check bounce and only *you* will be responsible for the lost cash or bitcoin. In short, if someone is sending you money just so you can send money somewhere else, be very suspicious.

- **Advance Fee scam**: Someone contacts you to tell you that you've been awarded a grant, lottery winnings, or are due to receive an inheritance. The scammers often impersonate governments or lawyers. To receive this award, **you have to first send bitcoin** through an ATM for the "processing fees" or "taxes". The scammer will then disappear and leave you high and dry. Never pay governments or lawyers via Bitcoin / digital currencies, especially if they are promising you something or contact you out of the blue.

Complaint Exhibit A, Page 4 of 5

request a withdrawal, the website will request payments of fees and taxes using new money. Many would-be investors end up paying these fees and wind up losing even more money.

**Always call your friend to verify any investment situation and never allow social media ads or direct messages to strongly influence your investing decisions.**

- **Ponzi / Pyramid schemes**: Victims will see ads for investment programs promising unusually high rates of return. Claims are often made to behind-the-scenes forex or digital trading. Many also advertise their own new token as being a "better Bitcoin" where you can get in on the ground floor—the implication being that it will, too, experience Bitcoin-like rates of explosive growth. Unfortunately, virtually all of these are scams. The investment principal from later investors are used to pay out the earlier investors until the whole scheme collapses. **One of the biggest warning signs are promises to pay a specific percentage of earnings daily or weekly.** Pyramid schemes are often tacked on in the form of referral bonuses. They rely upon ever expanding downstream networks of distributors to promote the scheme and are also doomed to collapse.

*Bitconnect* is a famous example of a Ponzi and Pyramid scheme from 2017/18 whose token lost 99% of its value following state regulatory pressure (1,2,3). Other notable scams include **Onecoin, Gladiacoin**, and **USI-Tech**.

**Ponzis will always exist in one form or another and wreck many naive investors' lives.** Don't let it happen to you.

## Fake Merchandise Scams

These are listings for "great deals" on typically high-value items on Craigslist, eBay, OfferUp, Amazon, and other places where individuals can post ads. They are most likely selling....

- **Apartment rentals / down payments**: Scammers either point to legitimate listings on Airbnb or other listing sites, create copycat websites that look like these sites, or possibly create their own fake listings just to lure people into a conversation outside of a legitimate rental website. Once the victim communicates with them **the scammer will give the victim instructions via email** or some other channel to pay for their "reservation" or "down payment" with bitcoin. We've also seen EasyRoommate and HomeAway affected by this.

- **Tickets for concerts or other events**: Scammers will list on Craigslist or other individual ad sites fake or non-existent concert tickets sold for bitcoin. As is usual in these cases, the scammer will just disappear, and you will be out hundreds of dollars. We've seen **theme park** tickets also the subject of this scam.

- **Used cars / eBay Motors scam**: The scammer will post a used car for a very low price on Craigslist, reusing photos and data from some older or legitimate listing elsewhere. The scammer will often tell a personal story involving the death of a family member or military deployment forcing them to sell the car. They will also promise to ship the car to the buyer, offering no way to meet in person. **What's worse is that they will go to great lengths make their emails look real,** but the car doesn't exist, eBay has no knowledge of it, and the victim will simply lose their money.

eBay, Amazon, Airbnb, Ticketmaster, and many other major retailers DO NOT *yet* accept bitcoin!

**...and if they did, they would do so only through their own secure websites.**

---

Unsure about a payment? **STOP! ...and give us a call (312-690-4466) or** **message.** We can't determine if your destination is legitimate, but we can help you assess the risk that it may not be. Likewise, anyone can call out to the **AARP Fraud Watch helpline** for advice and support: **877-908-3360** (Mon-Fri 7:00 am – 11:00 pm ET)



Complaint Exhibit B, Page 1 of 1



Complaint Exhibit C, Page 1 of 1





—

## FRAUD ALERT

—

# Imposter scams are the most common Bitcoin fraud that we see!

Imagine being in a panic thinking that you will be arrested or that money is about to be drained out of your bank account?

Imagine having someone on the phone with you for *hours* making sure you obey their instructions?

**Thousands of people** each year don't have to imagine....

"We will have to issue an arrest warrant in your name...."

— *Common variant of the social security / government imposter scam*

## If...



How To Spot A Tech Support Scam

02:28

- You receive a call or message saying that something is wrong with your bank, social security number, or that you are connected with a crime, **hang up or don't call back.**

- You receive a popup alert on your computer screen, **do not call the number presented**

- You are in a live call with someone who is requesting that you do something with your money, **hang up and research this on your own!**

- You are concerned about your social security number, ***dial out to*** your **local field office** or the national number: **800-772-1213**

- You are concerned that someone has stolen your identity, please visit **IdentityTheft.gov**



Complaint Exhibit D, Page 1 of 2

# Don't...

Cookie Consent

- **Withdraw physical cash** from your bank under the instructions of someone else, regardless of the reason given.

- **Make irreversible payments,** including bank wires, gift cards, physical cash, or **Bitcoin transactions**.

- Assume that the number on your Caller ID has anything to do with who is actually calling – numbers can be easily faked!

- Panic! Always hang up on whomever is distressing you and *take your time* to thoroughly analyze the situation.

- Go it alone! No matter what you are told, consult a trusted friend or family member (or visit your bank) to get a second opinion. The scammers want to *isolate you* and keep you from finding sound advice.

# Do...

- READ our **scam warning page** at least once!

- Report any scam attempt to the FBI's **Internet Crime Complaint Center** or call **VictimConnect** at 855-484-2846 (Mon-Fri 9:00 am – 5:00 pm ET)

- Include any Bitcoin address you were given by the scam artist in your reports to any agency, as Bitcoin addresses can be traced back to the perpetrators.

- SHARE this warning page with as many people as you can!

  Other helpful sites:

  - **https://www.ssa.gov/scam/**

  - **AARP Fraud Resource Center**

  - **https://www.ftc.gov/imposter**

  - **https://www.justice.gov/elderjustice/senior-scam-alert**

---

**It's NOT enough to protect just yourself from fraud ...**

Please help spread the word to your friends and family about the methods used by these scam artists.

The best way to prevent these types of fraud, nationwide, is through **education** and **awareness** before they happen.

Complaint Exhibit D, Page 2 of 2

# United States Senate

### WASHINGTON, DC 20510

September 11, 2024

Matias Goldenhörn
Chief Executive Officer
Athena Bitcoin
1 SE 3rd Avenue Suite 2740
Miami, FL 33131

Dear Mr. Goldenhörn:

We write to call on you to take immediate action to address troubling reports that your Bitcoin ATMs (BTMs) are contributing to widespread financial fraud against elderly Americans. Cryptocurrencies, including Bitcoin, have long been associated with criminal activity. The relative anonymity and irreversibility of cryptocurrency transactions has made them particularly attractive to fraudsters. As companies like yours have staged BTMs in a variety of businesses— sometimes even paying businesses to host your BTMs—there has been a marked increase in Bitcoin scams impacting elderly Americans. In light of these troubling reports, Athena Bitcoin must take all necessary steps to address this trend.

While Bitcoin has existed since 2009, BTMs only recently became widely available. These kiosks, which allow individuals to buy or sell Bitcoins with deposited cash, were first introduced in 2013. While only approximately 1,200 BTMs were available in the United States at the end of 2017,[1] that number has since grown to over 32,000.[2] Today, BTMs are found in a variety of supermarkets, convenience stores, gas stations, restaurants, liquor stores, and laundromats.

As BTMs have become more prevalent and accessible, they increasingly have become a favored tool of criminals looking to prey upon elderly Americans. A 2021 FBI Public Service Announcement described the common features of this fraud. "The scammer often requests payment from the victim and may direct the victim to withdraw money from the victim's financial accounts, such as investment or retirement accounts. The scammers provide a QR code associated with the scammer's cryptocurrency wallet for the victim to use during the transaction. The scammer then directs the victim to a physical cryptocurrency ATM to insert their money, purchase cryptocurrency, and use the provided QR code to auto-populate the recipient address. Often the scammer is in constant online communication with the victim and provides step-by-step instructions until the payment is completed."[3]

---

[1] *See* Sari Harrar, *What to Know About Cryptocurrency ATMs and Why Criminals Love Them*, AARP, (Mar. 29, 2024), https://www.aarp.org/money/scams-fraud/info-2024/crypto-atm.html.
[2] *See Bitcoin ATMs in the United States*, COIN ATM RADAR, https://coinatmradar.com/country/226/bitcoin-atm-united-states/ (last visited Sept. 5, 2024).
[3] FEDERAL BUREAU OF INVESTIGATION, THE FBI WARNS OF FRAUDULENT SCHEMES LEVERAGING CRYPTOCURRENCY ATMS AND QR CODES TO FACILITATE PAYMENT (Nov. 4, 2021), available at https://www.ic3.gov/Media/Y2021/PSA211104.

Complaint Exhibit E, Page 1 of 4

This scheme has played out time and again in cities and towns across the United States. Earlier this summer, a small business owner in Springfield, Illinois, reported that a Coinhub BTM in his store repeatedly had been used by elderly individuals to deposit large sums of money at the urging of fraudsters. As he explained, "Scammers find these vulnerable people that aren't up on the latest technologies and they scare them on the phone, they tell them they are from the bank or the FBI and they are being watched, and they need to drop the money into this bitcoin machine."[4] Similar scenarios have played out in Texas,[5] California,[6] and seemingly every other state in the country.

According to data recently released by the Federal Trade Commission, BTM scams have exploded in recent years. Between 2020 and 2023, the amount consumers reported losing in this form of fraud increased nearly tenfold—from $12 million to $114 million. In the first half of this year alone, victims lost a whopping $65 million. And criminals are targeting elderly Americans, with people age 60 and older more than three times as likely to report a loss using a BTM than younger adults.[7]

Small business owners and everyday citizens have tried to step in and stop this increasing criminal activity on BTMs. The aforementioned small business owner in Springfield had the BTM removed from his store;[8] another Springfield shop owner taped a fraud warning to the screen of the BTM in his shop;[9] and a good Samaritan in Texas called 911 to enlist police assistance to stop an elderly woman in her 80s from depositing $40,000 of her savings in the Bitcoin wallet of a criminal.[10]

While the actions of these good Samaritans are laudable, they do not absolve Athena Bitcoin from taking all requisite steps to ensure your BTMs are not used to perpetuate fraud.

To better understand what actions Athena Bitcoin is taking to address this problem and what legislation may be necessary, we ask that you respond to the following questions no later than October 4, 2024:

1. Does Athena Bitcoin display a warning or other notification to customers that BTMs have been used to perpetuate fraud?

---

[4] David Blanchette, *No more bitcoin for one Springfield business*, ILLINOIS TIMES (July 26, 2024), available at https://www.illinoistimes.com/news-opinion/no-more-bitcoin-for-one-springfield-business-18836453#.

[5] Peyton Yager, *North Texas officer confronts man on phone scamming elderly woman: 'You freaking moron!'*, FOX4 NEWS (July 14, 2024), available at https://www.fox4news.com/news/white-settlement-scammer-phone-call-bitcoin-atm-scam-with-elderly-woman.

[6] *See, e.g.*, Queenie Wong, *Scammers exploit bitcoin ATMs. Will new California laws help crack down on fraud?*, Los Angeles Times (Oct. 22, 2023), available at https://www.latimes.com/california/story/2023-10-22/scammers-are-exploiting-bitcoin-atms-will-new-limits-help-crack-down-on-fraud.

[7] Emma Fletcher, *Bitcoin ATMs: A payment portal for scammers*, FEDERAL TRADE COMMISSION (Sept. 3, 2024), available at https://www.ftc.gov/news-events/data-visualizations/data-spotlight/2024/09/bitcoin-atms-payment-portal-scammers.

[8] *See supra*, footnote 4.

[9] *See id.*

[10] *See supra*, footnote 5.

Page 3

2. What form of identification, if any, does Athena Bitcoin require a customer to provide when making a deposit or other transaction?  Does the form of identification differ depending on transaction size?

3. Does Athena Bitcoin have a minimum or maximum amount on the transaction size permitted on one of your BTMs?

4. Does Athena Bitcoin limit the amount an individual can deposit or transfer in a single day, week, or other period of time?

5. What is the average deposit and average transfer on an Athena Bitcoin BTM?

6. Does Athena Bitcoin hold deposited and transferred funds for any period of time or take any other measures to allow transactions to be reversed in the case of fraud or mistake? If not, does Athena Bitcoin warn customers that funds deposited in or transferred to another individual's Bitcoin wallet cannot be recovered even if the transaction was the result of fraud or mistake?

7. Does Athena Bitcoin insure depositors against fraud?

8. What customer support does Athena Bitcoin offer if an individual is defrauded?

We look forward to your prompt response.

Sincerely,

Richard J. Durbin
United States Senator

Richard Blumenthal
United States Senator

Elizabeth Warren
United States Senator

Tina Smith
United States Senator

Sheldon Whitehouse
United States Senator

Peter Welch
United States Senator

Complaint Exhibit E, Page 3 of 4

MID-L-003296-25   05/30/2025 9:13:40 PM   Pg 56 of 56   Trans ID: LCV20251633326
Case 2:25-cv-14063-ES-MAH     Document 1-1     Filed 08/01/25     Page 57 of 59 PageID: 68

Page 4

Jack Reed
United States Senator

# Civil Case Information Statement

## Case Details: MIDDLESEX | Civil Part Docket# L-003296-25

**Case Caption:** GNADINGER RACHEL  VS ATHENA
BITCOIN, INC.

**Case Initiation Date:** 05/30/2025

**Attorney Name:** HENRY PAUL WOLFE

**Firm Name:** THE DANN LAW FIRM, PC

**Address:** 825 GEORGES ROAD 2ND FLOOR
NORTH BRUNSWICK NJ 08902

**Phone:** 2163730539

**Name of Party:** PLAINTIFF : Gnadinger, Rachel

**Name of Defendant's Primary Insurance Company**
(if known): Unknown

**Case Type:** COMPLEX COMMERCIAL

**Document Type:** Complaint with Jury Demand

**Jury Demand:** YES - 6 JURORS

**Is this a professional malpractice case?**  NO

**Related cases pending:** YES

**If yes, list docket numbers:** MON-L-003971-24     DNJ 23-cv-21905

**Do you anticipate adding any parties (arising out of same
transaction or occurrence)?** NO

**Does this case involve claims related to COVID-19?** NO

**Are sexual abuse claims alleged by: Rachel Gnadinger?** NO

**Are sexual abuse claims alleged by: Madeline McCausland?** NO

**Are sexual abuse claims alleged by: Joanne Nebus-Horning?** NO

## THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE
### CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

**Do parties have a current, past, or recurrent relationship?** NO

**If yes, is that relationship:**

**Does the statute governing this case provide for payment of fees by the losing party?** NO

**Use this space to alert the court to any special case characteristics that may warrant individual
management or accelerated disposition:**
Consumer Class Action with multiple named plaintiffs and multiple defendants

**Do you or your client need any disability accommodations?** NO
         **If yes, please identify the requested accommodation:**

**Will an interpreter be needed?** NO
         **If yes, for what language:**

**Please check off each applicable category: Putative Class Action?** YES  **Title 59?** NO  **Consumer Fraud?** YES
**Medical Debt Claim?** NO

I certify that confidential personal identifiers have been redacted from documents now submitted to the
court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b)

05/30/2025
Dated

/s/ HENRY PAUL WOLFE
Signed